AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>MAHENDAR SINGH, a/k/a "Mike Singh," and<br>HELEN JEAN SINGH,<br><br>_____<br>_Defendant(s)_ | )<br>)<br>)<br>)<br>)<br>) |

Case No. **4 11-71127** MAG

## REDACTED (with corrected penalties)
## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
Beginning on a date unknown, but no later than in or about April 2011, and continuing until
On or about the date(s) of _____August 20, 2011_____ in the county of _____San Mateo_____ in the
_____Northern_____ District of ____California & elsewhere____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code,<br>Sections 371 & 1594(c) | Conspiracy to commit an offense against the United States, to wit, Title 18,<br>United States Code, Section 1591 (sex trafficking of children or by force fraud<br>or coercion) |

This criminal complaint is based on these facts:

   See attached Affidavit.

PENALTIES:
(1) Imprisonment: ████████████
████████████████████████ lifetime maximum
(2) Fine: $250,000
(3) Supervised Release: 5 years ████████ maximum
(4) Special Assessment: $100.00
(5) Forfeiture

☑ Continued on the attached sheet.

Approved as to form: _____ 10/3/2011
                        AUSA Huang

_____
Complainant's signature

FBI Special Agent Garth Badgley
_Printed name and title_

Sworn to before me and signed in my presence.

Date: ___10/3/11___

_____
Judge's signature

City and state: _____Oakland, California_____

United States Magistrate Judge Laurel Beeler
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Garth R. Badgley, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been employed in that capacity since April 2009. My primary responsibility is the investigation of violent crimes, including crimes against children. I am one of the case agents of the joint investigation by the FBI and Homeland Security Investigations ("HSI"), U.S. Department of Homeland Security detailed below.

2.      This affidavit is made in support of a criminal complaint against and the issuance of warrants for the arrest of MAHENDAR SINGH, a/k/a "Mike Singh" ("SUBJECT 1"), and HELEN JEAN SINGH, a/k/a "Helen Jean Kearney" ("SUBJECT 2") for violating 18 U.S.C. §§ 371 & 1594(c) (conspiracy). As set forth more fully below, the investigation to date indicates there is probable cause to believe that SUBJECT 1 and 2 conspired to violate 18 U.S.C. § 1591 (sex trafficking of children or by force, fraud, or coercion), by, *inter alia*, recruiting, enticing, harboring, transporting, and providing teenage females (collectively, the "VICTIMS"), including at least two juveniles who were approximately 16- years old, for commercial sex acts. Further, the investigation has revealed that there is probable cause to believe that SUBJECTS 1 and 2 did so through the use of force, threats of force, and coercion and knowing, or in reckless disregard of the fact, that at one or more of the VICTIMS were juveniles, *i.e.*, under the age of 18.

3.      This affidavit contains information known to me through my personal observations made during the course of this investigation; evidence received from other law enforcement personnel; and my review of records, documents, and other physical evidence obtained during this investigation. Unless otherwise noted, wherever in this affidavit I assert that

a statement was made by an individual, that statement is described in substance and in part, and is not intended to be a verbatim recitation of such statement. Additionally, this affidavit is not intended to include each and every fact and matter known to the government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts that are necessary to establish that there exists probable cause that SUBJECTS 1 and 2 committed the crimes described herein. This affidavit is also based upon my training and experience as an FBI agent and that of other FBI agents and law enforcement personnel with whom I have discussed this matter.

## FACTS ESTABLISHING PROBABLE CAUSE

*Overview*

4.     The investigation to date has revealed evidence indicating that SUBJECTS 1 and 2 operated a commercial sex services (i.e., prostitution) business at least as early as April 2011 and continuing until SUBJECTS 1 and 2's arrests by the South San Francisco Police Department ("SSFPD") on 8/20/2011. During this time, SUBJECTS 1 and 2 used at least four teenage female VICTIMS, including two juvenile victims, to provide sex services to customers in exchange for money and other things of value.

5.     To maintain the VICTIMS in their employ, SUBJECTS 1 and 2, among other things, enticed the VICTIMS with money and drugs and coerced them through use of force and/or the threatened use of force.

*South San Francisco Police Department Investigation*

6.     On 08/20/2011, SSFPD responded to the Travelodge Hotel located in South San Francisco after learning that a 16 year old runaway juvenile ("JV1") from Sacramento may be

2

staying in room number 775. SSFPD learned that rooms 774 and 775 were registered to SUBJECT 1, who, during a subsequent telephone conversation with SSFPD officers, claimed that the only persons in his rooms were his "step-daughters," who were too afraid to open the door for the police.

7.      With SUBJECT 1's consent and cooperation, SSFPD found JV1 and JV2 in room 774. AV1 was found in room 775. JV1 initially provided a false birthday, claiming to be 19 years old, but later admitted to being on juvenile probation and being subject to search and seizure.

8.      JV2 stated she was 16 years old and that JV1 and AV1 were friends. JV2 babysat for SUBJECT 1 and his wife "Helen." JV2 claimed that she knew SUBJECT 1 for several years and that he was "like a father to me." She stated that her mother met SUBJECTS 1 and 2 and let her take a trip with them. She denied any involvement in prostitution and denied knowing what her friends were involved in.

9.      AV1 wore tight jeans, had a thick layer of makeup, and appeared exhausted. AV1 did not have identification and was from the State of Washington. Upon prompting by SUBJECT 1, AV1 stated she was SUBJECT 1's stepdaughter.

10.     SUBJECT 1 claimed he used to be married to JV1's mother, "Julie" and he knew JV1 for four years. After JV1 stated her mother's name was "Candy," SUBJECT 1 stated he considered himself to be their step-dad because he took care of them and stated that they were just "hanging out" as a "family." SUBJECT 1 identified JV2 as his babysitter and a friend of his

3

stepdaughters. SUBJECT 1 denied knowing JV1 was a minor and a runaway. SUBJECT 1 gave verbal consent to search rooms 774 and 775.

11.     SSFPD observed that room 774 was neat with mostly male clothing in the closet. JV1 claimed her belongings were in room 775.

12.     SSFPD observed that room 775 was in a state of disarray, with female clothing on the floor and numerous towels and sheets all over, had an overwhelming scent of perfume, and the two beds inside were not made. Located in the room was an open box of condoms behind the nightstand, several used condoms inside the trash can, and $220 in cash inside a cigarette box. Neither SUBJECT 1 nor any of the VICTIMS claimed ownership of the $220. (SSFPD also determined that two of the $20 bills recovered among the cash was counterfeit.) AV1 claimed she and JV1 shared all of the clothing, which, SSFPD noticed, included an unusually large amount of lingerie.

13.     Inside room 774, SSFPD also found a Dell laptop computer on the bed. JV1, who denied being involved in prostitution, claimed that the laptop was hers and gave SSFPD consent to view the computer's content. JV1 provided the username and password for the computer. SSFPD found photographs of SUBJECT 2, AV1, JV1, JV2, and other females posing in lingerie. In the Internet browser history was evidence that myredbook.com was recently accessed. I know from my experience and training that myredbook.com is an Internet website used for advertising escort and commercial sex services. SSFPD found photographs that appeared to be family photographs of SUBJECTS 1 and 2 on the computer.

4

14. Suspecting SUBJECT 1 was a pimp and knowing that individuals involved in pimping and prostitution frequently carry weapons for protection, SSFPD conducted a pat-down search of SUBJECT 1 and found a LG brand cellular telephone in his pants pocket. SUBJECT 1 gave consent to SSFPD to search the telephone. During the search of SUBJECT 1's telephone, SSFPD received a call from a number ending in -0197 and listed as "Escort" on the telephone. SUBJECT 1 stated that it was his wife who was calling. SSFPD found the following text-messages exchange on the cellular phone:

Outgoing: 08/20/2011 01:19 p.m. "In the bay u want the girls tomorrow"

Incoming: 08/20/2011 01:19 p.m. "Yeah man"

Outgoing: 08/20/2011 01:47 p.m. "When u want them"

Incoming: 08/20/2011 01:47 p.m. "At two sunday"

Outgoing: 08/20/2011 01:49 p.m. "cool both girls"

15. Using his mobile telephone, an SSFPD officer located an advertisement for AV1 on the Internet website myredbook.com that was posted on 08/20/2011 at 1:07 p.m. The phone number listed for AV1's website was the same number listed as "Escort" on SUBJECT 1's telephone. Based on this advertisement, the condoms in the garbage can, and the $220 recovered in the room, AV1 was arrested for illegal prostitution by SSFPD.

16. SSFPD took custody of JV1 as a missing runaway. While being transported to the police station, JV1 related that SUBJECT 1 forced her into prostitution and, while she

5

initially wanted to, SUBJECT 1 would not let her stop. JV1 charged $100.00 and gave SUBJECT 1 $50.00. She was scared of SUBJECT 1 and requested not to have to see him.

17.     At the police station, while questioned about whether she knew about JV1's and AV1's involvement in prostitution, JV2 told SSFPD that she was aware of an escort business and that men paid for time, not sex, with the girls. She denied doing any escorting. Confronted with a photograph of her in lingerie, JV2 told SSFPD that she took the picture because she was thinking about becoming an escort.

18.     SUBJECT 1 SSFPD contacted JV2's mother and advised the mother that JV2 was in South San Francisco with individuals involved in illegal prostitution. JV2's mother stated that she knew her daughter was going to the Bay Area with friends, but was unaware of the type of people she was with. SSFPD took custody of JV2 for later release to her mother.

19.     SSFPD advised SUBJECT 1 he was not under arrest, but asked him whether he was willing to go to the police station for further questioning regarding his relationship with the females. SUBJECT 1 agreed to go on his own free will and sat, not handcuffed, in a patrol vehicle to the station. Upon SUBJECT 1's arrival at the police station the transporting SSFPD officer advised SUBJECT 1 that JV1 accused him of forcing her into prostitution and alleged that JV1 was too fearful to say anything in front of SUBJECT 1. Based on JV1's statement and evidence collected at the Travelodge, SSFPD placed SUBJECT 1 under arrest for pimping and pandering and SUBJECT 1was handcuffed outside of the police station.

20.     JV1, though not under arrest, was advised of her Miranda rights and related the following to SSFPD:

6

a.   JV1 ran away from home a couple of months ago.  JV1 met up with a friend from school whose brother, an Unknown Male ("UM1"), was a pimp.  On the day she ran away from home, UM1 introduced JV1 to SUBJECT 1 and SUBJECT 1's girlfriend SUBJECT 2.

b.   JV1 never worked for UM1, but UM1 persuaded JV1 to work for SUBJECT 1. SUBJECT 1 told JV1 she always had a place to stay and all the drugs she wanted. SUBECT 1 told JV1 that they were a family and SUBJECT 1 was not a pimp. JV1 initially accepted the agreement because of the drugs, money, and shelter.

c.   JV1 attempted to return home because she did not want to continue working as a prostitute.  SUBJECT 1 stood over her and told her she was not allowed to leave. SUBJECT 1 threatened JV1 by stating he would put hands on her.  JV1 told SUBJECT 1 that she was a runaway with a warrant for arrest.  JV1 wanted to call the police, but SUBJECT 1 prevented her by saying she was a "cop-calling bitch." SUBJECT1 told JV1 that he has broken a girl's jaw.

d.   The threat of force compelled JV1 to accept multiple clients per day.  JV1 serviced a total of twenty clients, mostly in Motel 6 South San Francisco, California and Vagabond Inn in San Jose, California.

e.   In the beginning JV1 received half of the money clients paid for her services, but later SUBJECT 1 took all the proceeds.  SUBJECT 1 always remained close in the area and collected the money from JV1 before distributing JV1's share, if any, to her.

7

    f.   AV1 took photographs of JV1 for her advertisement on myredbook.com. Clients were charged based on time at the rate of $100 per hour for JV1.

    g.   AV1 maintained an "Escort" phone, which was used to arrange clients for JV1.

    h.   JV1 stated her willingness to testify in court against SUBJECTS 1 and 2.

21.     JV2, though not under arrest, was advised of her Miranda rights and related the following to SSFPD:

    a.   JV2 met SUBJECT 1 during Spring Break in Marysville, California while she was with her friend, 18-year old ADULT VICTIM 2 ("AV2"). (AV2 was not at the Travelodge on 08/20/2011.) SUBJECTS 1 and 2 offered JV2 a babysitting job approximately a month before. JV2 explained AV2, SUBJECTS 1 and 2 "cornered" her and convinced her to work as a prostitute. On another occasion, SUBJECT 1, SUBJECT 2, AV1, AV2, and another unidentified female attempted to convince her to work as a prostitute. JV2 knew AV2 was beaten in the past and forced to pay two months' worth of work before she could leave SUBJECTS 1 and 2's prostitution operation.

    b.   For SUBJECTS 1 and 2's financial gain, JV2 had sexual contact with three different clients. The first client had sex at AV2's apartment. SUBJECTS 1 and 2 directed JV2 to have sex with this client. The second client had sex with JV2 three times, the last time on the morning of 08/20/2011 with the client paying $100 dollars for her services. JV2's third client paid $40 dollars for six minutes.

8

Each time, SUBJECT 1 collected payment from the clients and paid half of the

proceeds to JV2.

22.     After her recorded interview, JV2 also related to SSFPD that she masturbated

clients for money, but denied performing oral sex because of the retainer in her mouth.  JV2 gave

SSFPD consent to search her cellular telephone.  The search revealed the following text

messages from "Helen," which was the same number as the one listed as "Escort" on SUBJECT

1's telephone and on AV1's myredbook.com advertisement:

> 08/20/2011 21:26:37 (GMT): "Tell she has a appoint at 3:10 And that is that last one until
> six"
> 08/20/2011 21:28:39 (GMT): "[AV1] okay [JV2] does not need to rest we are heading to
> height an ashbury"
> 08/20/2011 21:50:12 (GMT): "Okay so I hope she chilling until her next appointment"
>
> 08/20/2011 23:03:22 (GMT): "[AV1] has a call coming at five for a half hour"
>
> 08/20/2011 23:39:11 (GMT): "There are always going to be a cop"
>
> 08/20/2011 23:59:43 (GMT): "Her appointment is minute away"

23.     During the consensual search of JV2's phone, JV2 received a message from a

phone number ending in -0790.  The message stated, "You do not talk to them until your mom or

attorney is there."  JV2 stated the message was from SUBJECT 2 but, did not recognize the

number.  (SUBJECT 2 later admitted that the -0790 telephone number as hers.)

24.     Based on JV1's and JV2's statements, SSFPD suspected that AV1 was forced into

prostitution.  Advising her that she was still under arrest for prostitution, AV1 was advised of her

Miranda rights and related:

9

a.  About two months ago, AV1 recently completed drug rehabilitation for methamphetamine use and was staying at the Vagabond Inn in San Jose, California. SUBJECT 1 approached AV1 at a 7-11 store parking lot and asked if she was working and if she wanted to meet up with his wife at a Motel 6. AV1 believed, at the time, that SUBJECTS 1 and 2 wanted her to join an escort business, *i.e.*, payment for dates, not sex. She distinguished escort businesses from "Fuck for a buck" operations, *i.e.*, prostitution.

b.  SUBJECTS 1 and 2 moved AV1's belongings from the Vagabond Inn to their hotel room at the Motel 6. The next day SUBJECTS 1 and 2 drove AV1 to Sacramento where they lived in an apartment complex. AV1 had her first client that night and realized it was a prostitution operation.

c.  AV1 came to understand that she was expected to sexually service clients. She was initially paid half of the proceeds and received shelter, food, and drugs for her prostitution activities.

d.  During her employment with SUBJECTS 1 and 2, SUBJECTS 1 and 2 directed JV1 to beat up AV1. SUBJECT 1 held AV1 down so that JV1 could hit her. AV1 believed that SUBJECT 1 had broken another worker's jaw and ribs. (JV1 later confirmed SUBJECT 1 had forced her to beat up AV1 because AV1 had violated a rule by calling a friend.)

e.  AV1 said she was afraid to testify but, when "push comes to shove," she would testify.

10

25.     Following the recorded statement, AV1 stated that SUBJECT 1 provided them with methamphetamine to stay awake and work all night by having sex with clients for money and that SUBJECTS 1 and 2 concealed the methamphetamine outside the hotel room. AV1 discarded the methamphetamine, crushed the methamphetamine pipe and flushed the pipe down the toilet when the police arrived at the Travelodge.

26.     Believing AV1 to be a victim of human trafficking, SSFPD released AV1 for insufficient grounds to file a criminal complaint.

27.     SSFPD subsequently located a myredbook.com advertisement featuring JV2 and using the "Escort" phone number as the one listed in AV1's advertisement and for the incoming call listed as "Escort" on SUBJECT 1's phone.

28.     SUBJECT 2 returned to the Travelodge and subsequently encountered SSFPD. She was taken into custody and identified her cellular telephone number as the number ending in -0790. She refused to consent to a search of her vehicle.

29.     SSFPD subsequently arrested SUBJECT 2 for pimping and pandering. SSFPD observed a cellular telephone in plain view inside SUBJECT 2's car. When SSFPD dialed the "Escort" phone number, the telephone responded and SSFPD seized the phone as evidence of a crime. When SSFPD opened the vehicle to seize the phone, the SSFPD officer detected the strong odor of marijuana in the vehicle. SSFPD conducted a probable cause search of the vehicle for marijuana and found, among other things, a plastic baggy of what appeared to be marijuana, assorted marijuana paraphernalia, a purse containing a red Acer Aspire laptop computer, and a yellow notepad with imprints of numbers listed in three columns and JV1's,

11

JV2's, and AV1's names at the top of each column (appearing to be what is commonly known as a pay/owe sheet), $1,496 in U.S. Currency, and a pink camera.

30.   After being advised of her Miranda rights, SUBJECT 2 related the following:

a.   SUBJECT 2 said SUBJECT 1 was unemployed and she is self-employed through AVON. SUBJECT 2 initially denied any involvement with prostitution. She also denied bringing young girls to their home, and knowing whether AV1 was a prostitute. She later claimed that AV1 and JV1 lived with her and her husband.

b.   SUBJECT 2 denied owning the phone found in the center console of her car and denied that she answered the phone when SSFPD called the phone and that the phone was neither hers nor her husband's. She later said she knew who the "Escort phone" belonged to, but stated, "I can't do it dude. I can't send my husband to jail." SUBJECT 2 claimed she "never ever" spoke on the phone with clients.

c.   She admitted to possessing a little, family computer (believed to be the red Acer Aspire) in her car, but denied knowledge of the cash recovered within the car. She claimed "everyone" had access to the computer.

d.   JV2 lived with her mother, not SUBJECTS 1 and 2. JV2 told SUBJECTS 1 and 2 that AV2 tried to recruit JV2 to work as an escort for AV2. SUBJECT 2 denied getting involved with JV2 because she knew JV2 was a minor.

e.   JV1 came from another pimp, UM1. AV2's pimp was her boyfriend. JV1 saw AV2's pimp beat up AV2. SUBJECTS 1 and 2 witnessed AV2's boyfriend break

her jaw. JV1 then wanted SUBJECTS 1 and 2 to take care of her. JV1 stayed with SUBJECTS 1 and 2 and helped pay the bills. SUBJECTS 1 and 2 gave JV1 rides. JV1 claimed she was 19 years old and never stated she was a runaway. SUBJECT 2 claimed JV1 already knew how to do her business. SUBJECT 2 denied receiving money. AV1 pimped herself out.

f.   The telephones and computers are SUBJECT 2's, but she lets the victims use them.

g.   SUBJECT 2 admitted that the marijuana and Adderall recovered from the car were hers.

h.   AV1 texts clients from the "Escort" phone. AV1 maintains the telephone because she was responsible for customer service.

i.   SUBJECT 2 worked with AV1. SUBJECT 2 set up clients for AV1 and no one else. AV1 is also the only person SUBJECT 2 saw work as a prostitute. SUBJECT 2 stated AV1 had four clients on 08/20/2011.

j.   AV1 once stated she wanted to leave and SUBJECTS 1 and 2 told her she could leave, but AV1 did not leave.

k.   JV1 said she had a warrant. SUBJECTS 1 and 2 stated they would call the police and told her to leave, but JV1 did not leave.

13

l.   JV1 set up JV2's clients. SUBJECTS 1 and 2 did not know JV2 was working. JV2 stayed in SUBJECTS 1 and 2's hotel room because they do not want JV2 to work.

m.   SUBJECT 2 denied knowing about receiving proceeds. She claimed that she paid the bills by selling AVON, using SUBJECT 1's unemployment benefits, and help from her parents. The victims did their business on their own; SUBJECTS 1 and 2 never threatened the victims.

31.   After being advised of his Miranda rights, SUBJECT 1 related the following:

a.   SUBJECT 1 denied pimping anybody, denied forcing anybody to do anything, and denied using force on anybody. He also denied doing drugs.

b.   SUBJECT 1 "took in" AV1 and JV1. He met AV1 in San Jose and stated that she was homeless at the time. He claimed that JV1 was being pimped by UM1 at the time he met her.

c.   SUBJECT 1 claimed that he was not involved in the prostitution business, that the females operated their own business, and that his only benefits were food and contributions to household bills. He stated that AV1 and JV1 handled their own telephone calls and Redbook matters. He stated that the "Escort" phone was AV1 and JV1's, not his or his wife's. He admitted that he gave them rides and helped them obtain hotel rooms.

d.   AV1 and JV1 told SUBJECT 1 that they were 18 years old and that he lied about being their "step-dad" because they had instructed him to do so.

14

e. SUBJECT 1 initially denied knowledge of the $1100 recovered from SUBJECT 2's car and claimed that the remaining $396 cash recovered from the car was in his jacket and was from his unemployment benefits, which he claimed was his only regular source of income for the past two to three months. He stated that SUBJECT 2 was self-employed through AVON and received $200 to $250 per week for the past eight to nine months.

f. SUBJECT 1 later stated that he knew that the $1100 from the car and the $180 recovered from the hotel room was AV1's. He stated that AV1 did not want money around while serving customers.

g. SUBJECT 1 claimed that he had only one telephone, the one that SSFPD recovered from him.

h. SUBJECT 1 denied ownership of the two-laptop computers recovered by SSFPD. For the Dell computer, he alleged that JV2 "was going to buy it." He claimed that the Acer computer was purchased by JV1 and AV1 at Wal-Mart.

i. SUBJECT 1 denied knowing that JV1 and AV1 were involved in prostitution, but conceded that they used the term "escorts" instead.

j. SUBJECT 1 admitted that he knew JV2 was 16 years old, claiming that her mother and SUBJECT 2 spoke to one another. He expressed surprise when told that JV2 was on Redbook.

k. AV1 asked SUBJECT 2 to take calls for a share of the proceeds, but denied that he shared in the proceeds.

15

32.    SSFPD searched SUBJECT 1's property prior to his transport to county jail. SSFPD found two bank receipts, one dated 08/06/2011 for a cash deposit of $750 and another dated 08/14/2011 for a cash deposit of $1320.

33.    SSFPD advised the victims' parents of the incident and arrests that were made. The victims were not medically examined. SSFPD provided the victims and their parents with victims' rights information.

*Citrus Heights Police Department's Investigation*

34.    On 08/21/2011, JV2's mother contacted the Citrus Heights Police Department ("CHPD") and JV2 provided the following additional information to CHPD Officers:

    a.    Approximately 1½ months ago, AV2 was prostituting for SUBJECTS 1 and 2. While they stayed in San Francisco, California, multiple men visited AV2 in a motel room where she had sex with them for money. AV2 was allowed to keep one half of the funds and provided the second half to SUBJECT S 1 and 2.

    b.    Prior to the San Francisco trip, JV2 heard SUBJECTS 1 and 2 tell AV2 that she was to keep having calls. This was JV2's first indication that AV2 was working for SUBJECTS 1 and 2. After the trip, AV2 told JV2 that SUBJECTS 1 and 2 would not let her leave. SUBJECTS 1 and 2 forced AV2 to have sex with men and physically injured her. JV2 never saw SUBJECTS 1 or 2 physically assault AV2, but JV2 observed bruises on AV2's body. AV2 told JV2 that SUBJECTS 1 and 2 caused the bruises on her body. The injuries included a broken jaw.

c.  In July 2011, SUBJECTS 1 and 2 picked JV2 up from her mother's residence and brought her to SUBJECTS 1 and 2's apartment in Citrus Heights, California where SUBJECTS 1 and 2 had her engage in oral sex and vaginal intercourse with three different men. JV2 could not remember how much each man paid. JV2 alleged that she felt that SUBJECTS 1 and 2 had manipulated her and that she would be hurt if she did not do what SUBJECTS 1 and 2 told her to do.

d.  On the weekend of 08/19/2011, SUBJECTS 1 and 2 invited JV2 to South San Francisco to babysit. JV2 agreed, with her mother's permission. SUBJECTS 1 and 2 also took JV1, and AV1. JV1 and JV2 babysat SUBJECTS 1 and 2's children while AV1 worked as a prostitute in the other room.

e.  JV2 stated JV1 originally prostituted for UM1 until they met AV2. AV2 introduced JV2 to SUBJECTS 1 and 2.

f.  JV2 saw SUBJECTS 1 and 2 provide all the girls narcotics including marijuana and a white powdery crystal-like substance that JV2 believed to be methamphetamine. JV2 refused the drugs but other girls did not.

***Subsequent Federal Investigation***

35.   Federal agents interviewed 18-year old AV2 on multiple occasions in September 2011. AV2 related the following:

a.  AV2 met SUBJECTS 1 and 2 around March 2011 and worked as a prostitute for them from around April 2011 to around August 2011. AV2 became SUBJECTS 1 and 2's first prostitute and eventually became "Queen Bee." (Based on training

17

and experience, I know that the Queen Bee, a/k/a the "Bottom Bitch," serves as middle management and is a supervisor level between a pimp and his prostitutes.) AV2 achieved this status once SUBJECTS 1 and 2 brought in AV1 and JV1.

b.   AV2 was released from the prostitution activities when she began undermining the prostitution operation by not accepting and relaying client requests to the other girls.  AV2 was required to pay approximately ten thousand dollars or two months' of work to SUBJECTS 1 and 2 in order to be released from the prostitution operation.  Until her debt was paid off, SUBJECTS 1 and 2 received all proceeds from AV2's clients.

c.   AV2 recounted two occasions where SUBJECT 1 assaulted her during her four-month employment with SUBJECTS 1 and 2.  The assaults were punishment for AV2's and JV1's misbehavior.  AV2 was responsible for AV1 and JV1's behavior and actions.  These assaults and the threats of more violence caused AV2 to be fearful for her safety and life.

d.   AV2 suffered an injury to her jaw as the result of one beating by SUBJECT 1. For a period of time, she could not open her mouth very wide.  She still suffers from discomfort when she opens and closes her mouth.

e.   AV2's responsibilities included, but were not limited to, photographing AV1 and JV1 for Redbook ads and posting ads when prostitutes were available.  AV2 noted that SUBJECTS 1 and 2 used three different phones as the "Escort" phone.  These

phones served as points of contact for the Redbook ads and were used to take photographs of AV1, AV2, and JV1.

f.   The Redbook ads were submitted to myRedbook.com using SUBJECT 2's laptop. AV2 provided a description of SUBJECT 2's laptop that matched the Dell laptop seized by SSFPD, *i.e.*, a Dell laptop computer with identical username and password.

g.   AV2 initially claimed that she introduced JV2 to SUBJECTS 1 and 2 with the intent that JV2 would babysit SUBJECTS 1 and 2's two young children while the prostitution activities occurred. AV2 later stated that she and JV2 met SUBJECTS 1 and 2 when an unidentified female friend ("UF1") introduced them during Spring Break earlier this year and AV2, JV2 and UF1 went to SUBJECTS 1 and 2's home to party.

h.   Later, SUBJECTS 1 and 2 forced AV2, under the threat of violence, to persuade JV2 to work as a prostitute. AV2 believed JV2 was already prostituting at this point and was coming over to SUBJECTS 1 and 2's apartment on her own.

i.   AV2 told SUBJECTS 1 and 2 that JV2 was only 15 years old. AV2 admitted knowing that JV2 used marijuana and drank alcohol.

j.   SUBJECTS 1 and 2 provided AV2 with methamphetamine (crystal meth), Adderall, cocaine, marijuana, and Xanax during the course of her tenure with SUBJECTS 1 and 2. AV2 explained that they used the drugs to help control her.

k. AV2 saw Don KEARNEY, 53 years old, who is SUBJECT 2's father, supply SUBJECTS 1 and 2 with marijuana and Adderall. In exchange for these drugs, SUBJECTS 1 and 2 forced AV2 to sexually service KEARNEY.

l. On one occasion, SUBJECTS 1 and 2 took AV2, along with AV2's boyfriend, to Reno, Nevada. They left the "Escort" phone with AV2, with the intent that she could serve customers while they were in Reno. AV2 did not accept any clients on this trip, but SUBJECTS 1 and 2 did not mind because they were preoccupied with celebrating a birthday. (During one interview, AV2 stated it was SUBJECT 1's birthday, but on another occasion related that it was SUBJECT 2's birthday.)

m. AV2 still smokes marijuana on occasion.

36. Federal agents interviewed 16-year old JV2 on 08/28/2011. JV2 related the following:

a. JV2 met SUBJECTS 1 and 2 earlier this year during Spring Break. JV2 planned to spend the week with AV2 in Yuba City, California, but AV2 had already agreed to go to Citrus Heights, California with another female friend, UF1. SUBJECTS 1 and 2 picked up all three females in Yuba City and drove them to SUBJECTS 1 and 2's Citrus Heights apartment.

b. Approximately one month later, SUBJECTS 1 and 2 confronted JV2 and demanded that she join in their prostitution activities. JV2 stated that AV2 and UF1 were present, but SUBJECTS 1 and 2 were responsible for scaring her into

20

the prostitution activities. JV2 was afraid to refuse SUBJECTS 1 and 2. JV2 believed SUBJECT 1 assaulted AV2 and broke her jaw.

c. When asked her age by SUBJECTS 1 and 2, JV2 responded that she was 16-years old. JV2 also knew AV2 told SUBJECTS 1 and 2 that JV2 was 16-years old, but SUBJECTS 1 and 2 did not care; SUBJECTS 1 and 2 just wanted the increased income believed JV2 would help appeal to a more diverse clientele for their prostitution business.

d. JV2 confirmed that she had a myRedbook.com account and that the photographs taken of her and posted to myRedbook.com were at the direction of SUBJECT 2. SUBJECTS 1 and 2 bought the outfits that JV2 was forced to wear. SUBJECTS 1 and 2 deducted cost of the outfits from JV2's share in the prostitution proceeds.

e. SUBJECTS 1 and 2 instructed JV2 on how to detect an undercover police officer. (AV2 related that she received similar instruction.) SUBJECTS 1 and 2 also instructed JV2 to provide "full service" to the clients, how to handle money from the clients, and to claim she was an adult if she believed a client was actually a police officer.

f. SUBJECTS 1 and 2 directed JV2 to her first client and stated that the client would tell them about JV2's performance. SUBJECTS 1 and 2 subsequently directed JV2 to serve additional clients for the profit of SUBJECTS 1 and 2.

37. Based on the information provided to Federal Agents for each witness and/or victim a review of law enforcement databases revealed the following information:

21

a.   AV2 has the following criminal history:

    i.   07/26/2010: 459 PC-Burglary – Disposition: Transferred to other jurisdiction.

    ii.   09/05/2010: 459 PC-Burglary – Disposition: Released/Handled Informally

    iii.   12/06/2010: 242 PC-Battery – Released/Handled Informally

b.



    i.

    ii.

## CONCLUSION AND REQUEST FOR SEALING

38.   Based on the aforementioned factual information, I have probable cause to believe that the defendants in the complaint, MAHENDAR SINGH, a/k/a "Mike Singh," and HELEN JEAN SINGH, a/k/a "Helen Jean Kearney," SUBJECTS 1 and 2, respectively, conspired to violate 18 U.S.C. § 1591 (sex trafficking of children or by force, fraud, or coercion), in violation of 18 U.S.C. §§ 371 & 1594(c) (conspiracy).

39.     Because, the criminal complaint, this affidavit, and the arrest warrants relate to an

ongoing investigation into violations of federal criminal law, including sex trafficking and child

exploitation, I believe that disclosure of the facts may alert potential targets, subjects, and

witnesses, reveal sensitive law enforcement information, disclose the identities of witnesses, and

could result in the destruction of evidence and/or witness tampering, and thus compromise this

and other investigations.  Accordingly, I request that the Court issue an order that the complaint,

this affidavit, and the arrest warrants be filed under seal until further order of this Court.


GARTH R. BADGLEY
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me
on October _3_/201

Hon. LAUREL BEELER
United States Magistrate Judge

23